IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BLUEFIELD DIVISION

MICHELLE LEE POWELL,      )
                    )
       Plaintiff,      )
                    )
v.                   )       CIVIL ACTION NO. 1:12-7781
                    )
CAROLYN W. COLVIN,      )
Acting Commissioner of Social Security,  )
                    )
       Defendant.      )

AMENDED PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB), under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Standing Order entered November 15, 2012 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Pending before the Court is Plaintiff's Brief/Objections (Document No. 12.), Defendant's Motion for Judgment on the Pleadings and Response to Objections (Document No. 15.), and Plaintiff's Reply. (Document No. 17.)[1]

The Plaintiff, Michelle Lee Powell, (hereinafter referred to as "Claimant"), filed an application for DIB on May 12, 2009 (protective filing date), alleging disability as of January 5, 2004, due to

---

[1] The undersigned entered Proposed Findings and Recommendation ("PF&R") on February 28, 2014, recommending that the District Court affirm the final decision of the Commissioner and dismiss this matter from the Court's docket. (Document No. 11.) On March 17, 2014, Plaintiff filed her Objections, which in essence was her opening brief as it raised issues for the first time for the Court's review. (Document No. 12.) By Memorandum Opinion and Order entered on March 27, 2014, District Judge David A. Faber referred the matter back to the undersigned for further briefing and to determine whether an amended PF&R needed to be entered. (Document No. 14.) The Commissioner filed her Brief in Support of Defendant's Decision and Response to Plaintiff's Objections (Document No. 15.) on April 21, 2014, and Plaintiff filed her Reply Brief on August 8, 2014. (Document No. 17.) The undersigned will construe Plaintiff's Objections/Brief and Defendant's Brief/Response as their respective Motions for Judgment on the Pleadings.

"L4/L5 bulging discs."[2] (Tr. at 11, 113, 114-16, 154, 158.) The claim was denied initially and upon reconsideration. (Tr. at 52-53, 54-56, 60-62.) On February 4, 2010, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 63.) The hearing was held on April 13, 2011, before the Honorable Geraldine H. Page. (Tr. at 28-51.) By decision dated July 21, 2011, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-22.) The ALJ's decision became the final decision of the Commissioner on September 18, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3.) Claimant filed the present action seeking judicial review of the administrative decision on November 15, 2012, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2011). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to

---

[2] Claimant stated that her conditions limited her ability to work as follows:

I have bulging discs at L4/L5. I had surgery 11/08 and now I can't feel my right foot halfway up my right leg. I am still having the same shooting pains up my back.

(Tr. at 158.) On her form Disability Report - Appeal, Claimant reported depression and an inability to be around people as new mental limitations since filing her last disability report. (Tr. at 185.)

Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2011).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> (c) Rating the degree of functional limitation. (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic

3

limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity during the period from her alleged onset date of January 5, 2004, through her date last insured of September 30, 2009. (Tr. at 13, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "discogenic degenerative disc disease, and status post lumbar surgery in November 2008," which were severe impairments. (Tr. at 13, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 14, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform light level work as follows:

> The [C]laimant can only perform occasional climbing of ramps and stairs, cannot climb ladders, ropes or scaffolds, and can only kneel, crawl, stoop, crouch, balance and climb ramps and stairs occasionally. The [C]laimant can only perform occasional overhead reaching. The [C]laimant could not work around hazards such as unprotected heights or dangerous machinery, and could not work on vibrating surfaces.

(Tr. at 17, Finding No. 5.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 20, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE")

taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a food preparer, an amusement and recreation attendant, and cashier, at the light level of exertion. (Tr. at 21-22, Finding No. 10.) On this basis, benefits were denied. (Tr. at 21, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on August 23, 1977, and was 33 years old at the time of the administrative hearing, April 13, 2011. (Tr. at 20, 34, 114.) Claimant had at least a high school equivalent education and was able to communicate in English. (Tr. at 20, 34-35, 157, 166.) In the past, she worked as a department store retail sales associate. (Tr. at 20, 35-36, 45, 144-49, 158-60.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence of record,

6

and will discuss it below as it relates to the undersigned's findings and recommendation.

**Mental Impairments**:

### *Dr. Ahmed D. Faheem, M.D., Psychiatrist - Appalachian Psychiatric Services*:

Claimant underwent a psychological evaluation and testing on April 19, 2004, by Dr. Faheem, for purposes of an evaluation for Worker's Compensation. (Tr. at 14, 251-54.) Claimant reported that she was injured on September 1, 1999, when she fell from a chair on which she was standing and sustained injuries to her right ankle, hip, and shoulder. (Tr. at 251.) She returned to that job as part-time status and changed jobs to sell jewelry until the store closed in August 2003. (Id.) Claimant stated that she had been unemployed since then but was taking GED classes. (Id.) Claimant further reported a motor vehicle accident in April 2001, in which she sustained a neck injury. (Tr. at 252.) She has received a 14% permanent partial disability rating upon the injury. (Id.) She denied any psychiatric problems or treatment prior to the accident and since then reported problems with anxiety and depression for which she has tried Paxil. (Id.) Claimant reported nervousness, crying episodes, feelings of sadness and anger, restless sleep, a decreased appetite with a ten pound weight loss, recurrent anxiety episodes, and thoughts of giving up. (Id.)

Claimant reported that she was taking Klonopin, Lortab, Paxil, and Ibuprofen. (Tr. at 252.) She indicated that her activities of daily living included performing her self-care, driving her son to the bus stop every morning, resting until 10:00 or 11:00 a.m., watching television, doing some housework, helping her son with his homework, playing some video games with her son, and going to the grocery store. (Id.) On mental status exam, Dr. Faheem observed that Claimant was tense and edgy; was generally pleasant and cooperative; maintained appropriate flow and content of conversation; was oriented to time, place, and person; had impaired attention and concentration; had difficulty with mental calculations and serial sevens; was able to give the days of the week in reverse order; had slightly impaired memory and recall for recent events; had intact judgment; had adequate fund of knowledge; had no obsessive thoughts or compulsive behaviors; and she denied any active suicidal

or homicidal ideations. (Tr. at 254.)

Dr. Faheem diagnosed depressive disorder NOS and assessed a GAF of 60.[4] (Tr. at 254.) He noted that Claimant has "reached the maximum degree of improvement that can be expected...[and] that based upon her psychiatric impairment, she is entitled to 4% permanent partial disability, which can be directly related and is secondary to the injury of 9/1/99." (Id.) Dr. Faheem further opined that Claimant's "psychiatric problems by themselves are not disabling and I do not feel that they are progressive." (Id.)

### *Sunny S. Bell, M.A., Licensed Psychologist - Psychological Evaluation*:

Ms. Bell also completed a psychological evaluation on April 19, 2004, on referral by Independent Medical Doctors, Inc., in conjunction with Dr. Faheem's psychiatric evaluation. (Tr. at 14, 255-58.) Ms. Bell observed that Claimant traveled one hour for the evaluation and was driven by her brother. (Tr. at 255.) Claimant reported feelings of hopelessness and helplessness, decreased energy and libido, being apathetic and withdrawn, vague suicidal thoughts but no attempts or plans, sleep difficulties, and a poor appetite. (Tr. at 255-56.) Claimant stated that she was taking GED classes and was scheduled to take the test that week. (Tr. at 256.) She reported her daily activities to have included housework, cooking, doing the laundry, watching a lot of television, shopping with her husband, managing the family finances, and caring for her personal hygiene and grooming independently. (Tr. at 256-57.) Claimant denied visiting friends, but stated that she visited family and attended family gatherings. (Tr. at 257.) She attended her son's sporting events and schools functions and occasionally ate out at restaurants. (Id.)

On mental status exam, Ms. Bell noted that Claimant interacted in an appropriate, friendly

---

[4]  The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994).

manner and spontaneously generated conversation and exhibited a sense or humor. (Tr. at 257.) She maintained good eye contact; appeared comfortable; had clear, goal-directed, and appropriate speech; had a depressed mood and restricted affect; reported no delusions, obsessions, or phobias; had adequate insight but moderately deficient judgment; was oriented fully; had normal immediate and remote memory skills but markedly deficient recent memory skills; had moderately deficient fund of information; her concentration was within normal limits; and she exhibited no gross psychomotor difficulties. (Id.) Psychological testing revealed a verbal IQ score of 79, a performance IQ of 72, and a full scale IQ of 74. (Id.) Ms. Bell opined that these test results were a low estimate of Claimant's true level of functioning because she was in pain and the scores were a reflection of her physical and emotional problems. (Id.) The WRAT-3 testing revealed that Claimant performed reading skills at a high school level and spelling and arithmetic at a fifth grade level. (Tr. at 258.) Ms. Bell diagnosed depressive disorder NOS and again noted that Claimant's test scores were "believed to be a low estimate of her true level of functioning." (Id.)

### *John Todd, Ph.D. - Psychiatric Review Technique*:

On August 8, 2009, Dr. Todd completed a form Psychiatric Review Technique on which he stated that Claimant failed to return the forms and therefore, he was unable to adjudicate due to insufficient evidence. (Tr. at 14, 483-96.) Dr. Todd noted on August 18, 2009, that his opinion remained the same as Claimant still had not submitted the forms. (Tr. at 498.)

### *James W. Bartee, Ph.D. - Psychiatric Review Technique*:

On January 22, 2010, Dr. Bartee completed a form Psychiatric Review Technique on which he, too, stated that because Claimant failed to cooperate and return the forms, there was insufficient evidence on which to complete an assessment. (Tr. at 14, 499-512.)

**Physical Impairments**:

### *Robert P. Kropac, M.D.*:

On September 30, 1999, Claimant was examined for complaints of lower back pain, pain and

numbness into the right lower extremity, and a sprain of the right ankle. (Tr. at 15, 194-99.) She reported that on September 1, 1999, she fell from a chair in which she was standing at work while changing a display item, flipped over and twisted her right ankle, fell onto her back and injured her lower back, right ankle, and right lower extremity. (Tr. at 194-95.) Dr. Branson applied a short leg cast to the right lower extremity for the sprain of the right ankle on September 5, 1999, and gave her Darvocet for pain and Flexeril. (Tr. at 195.) She reports constant low back pain, increased with bending, stooping, sitting, and standing. (Id.) The pain radiated down her right leg with sitting and standing, and at times, she experienced a numbness sensation in her right lower leg with prolonged sitting. (Id.)

Dr. Kropac noted on exam of the right ankle following removal of the cast that she had soft tissue swelling, tenderness to palpation, and limited range of motion. (Tr. at 196.) Manual motor testing of the toes and ankle was normal but associated with pain to some extent. (Id.) Exam of the lumbosacral spine revealed tenderness to palpation and limited range of motion with positive straight leg raising testing on the right. (Tr. at 196-97.) Claimant reported pain on hip exam. (Tr. at 197.) She was able to heel and toe walk with difficulty on the right secondary to right ankle pain and limitation of motion. (Id.) Her gait was antalgic with a shortened stance phase on weight bearing to the right lower extremity. (Id.) The x-rays of the right ankle were negative for any fractures. (Tr. at 198.) Dr. Kropac diagnosed lumbosacral musculoligamentous strain, rule out lumbar disc herniation, with right lower extremity radiculities and sprain of the right ankle. (Id.) He opined that Claimant was temporarily totally disabled and in need of further treatment and diagnostic care. (Id.) Dr. Kropac prescribed Lorcet, Motrin, and Skelaxin and recommended physical therapy for her back and right ankle. (Id.)

**_Kendall L. Wilson, Jr., D.O._**:

Claimant was examined by Dr. Wilson on May 18, 2000, at the request of Dr. Kropac for complaints of popping in Claimant's right hip and an inability to sit up straight without experiencing

stabbing pains shooting up her back side or numbness down her right leg. (Tr. at 15, 200-05.) Claimant reported that pain in the groin on the right side interfered with her ability to sit up straight and caused a stabbing pain in her back side when sitting. (Tr. at 201.) Dr. Wilson diagnosed somatic dysfunction, lumbar, pelvis, and sacrum; and chronic pain and dysfunction secondary to the somatic dysfunction. (Tr. at 203.) Dr. Wilson opined that the somatic dysfunction accounted for the majority of Claimant's pain, and that her prognosis was good with treatment. (Tr. at 203-04) Dr. Wilson recommended osteopathic manipulation. (Tr. at 204.)

### *Richard T. Jackson, M.D. - New River Valley Neurology Clinic*:

On June 13, 2000, Claimant was examined by Dr. Jackson on referral of her attorney for a neurological examination. (Tr. at 15, 206-10.) Claimant's worst complaint was constant right hip pain that increased when she sat straight up leading to her leaning towards the left when sitting in chairs. (Tr. at 207.) Her pain also was increased with bending and walking, and decreased her physical activity which caused her to gain twenty pounds. (Id.) She reported that pain radiated into the right thigh with spasms on walking and some feelings that her leg might give way. (Id.) Physical examination revealed low back tenderness, hip and leg pain, negative straight leg raising bilaterally. (Tr. at 208.) Neurological examination revealed normal mental status, occasional pain behavior, normal sensation, gait with a limp favoring the right leg that was eliminated if she walked slowly, normal heel standing and toe standing, normal squatting to standing, normal motor strength, and no signs of atrophy. (Tr. at 208-09.) In summary, Dr. Jackson noted that Claimant's neurological exam was normal and that her general examination revealed tenderness and tightness in the right hip flexors with pain by pressing the sciatic notch and right piriformis muscle, which was suggestive of a piriformis muscle strain. (Tr. at 209.) Dr. Jackson performed stretching exercises and recommended treatment at a chronic pain management center. (Id.) He diagnosed work-related right hip contusion and strain with referred pain into the right leg, rule out sciatic nerve injury, and chronic right hip myofascial pain. (Tr. at 209-10.)

11

Claimant returned for follow-up and electrodiagnostic testing on August 8, 2000. (Tr. at 15, 211-13.) Claimant reported that her pain had improved and that she limped only rarely. (Tr. at 211.) Since her last visit, she started seeing Dr. Wilson who prescribed weekly physical therapy, she started the exercises at home recommended by Dr. Jackson, she reduced her caffeine consumption as recommended by Dr. Jackson, she was more physically active, and she was sleeping better. (Id.) On exam, she had positive Faber's sign on flexion and internal rotation on the right which reproduced her hip pain, as well as some tenderness. (Id.) The EMG evaluation of the right hip and right lower extremity was normal without evidence of a sciatic neuropathy or radiculopathy. (Tr. at 211, 213.) Nerve conduction testing was not performed due to her improvement. (Tr. at 211.)

### Judith Brown, M.D. - Tri-State Occupational Medicine, Inc.:

On July 31, 2002, Dr. Brown, evaluated Claimant's back, left ankle, and right shoulder injury. (Tr. at 15, 225-35.) Claimant reported constant lower back pain in the center. (Tr. at 226.) She stated that prolonged sitting caused pain to shoot into her rectum and that bending, lifting, and walking exacerbated her pain. (Id.) She had swelling in the lower back region when she experienced a lot of pain and that the pain was eased by lying on her left side and by using heat. (Id.) She took Lortab for pain. (Id.) Claimant also reported pain radiation into the right posterior leg and knots in the right calf at night with numbness and tingling of both legs, more pronounced on the right when she sat for long periods of time. (Id.) Dr. Brown assessed right shoulder sprain, left ankle sprain, lumbosacral strain, and right SI joint sprain. (Tr. at 230.) Dr. Brown opined that Claimant had reached maximum medical improvement regarding the September 1, 1999, injury, and therefore, that vocational rehabilitation was not recommended. (Id.) Dr. Brown assessed a 14 percent impairment of the whole person for Claimant's September 1, 1999, injury. (Tr. at 230-32.)

### Victor Poletajev, D.C.:

On September 7, 2003, Dr. Poletajev assessed Claimant with a 29 percent whole body impairment from her work injury of September 1, 1999. (Tr. at 15, 244-49.) He assessed lumbosacral

12

sprain strain with residuals, right hip sprain strain with residuals, right shoulder contusions with sprain and residuals, and right ankle sprain strain with residuals. (Tr. at 247.) Dr. Poletajev noted that Claimant's prognosis was guarded, and noted exacerbations and symptoms of depression that needed further developed. (Tr. at 249.)

**_Dr. Kropac_**:

Claimant was examined by Dr. Kropac on August 1 and 4, 2005, for an independent medical examination. (Tr. at 15-16, 260-66.) Claimant reported that she had been asymptomatic regarding her neck and left knee pain until April 27, 2002, when she was involved in a motor vehicle accident. (Tr. at 260.) She states that another vehicle ran a stop sign and ran into the passenger side of her vehicle, which pushed her vehicle into the guardrail. (Id.) As a result, she was jerked about and jammed her knees into the dashboard. (Id.) The x-rays of the left knee from Bluefield Regional Medical Center revealed a contusion to the left knee. (Tr. at 264.) Claimant reported constant neck pain that was aggravated with motion of the head, neck, and upper extremities. (Tr. at 261.) She also reported knee pain precipitated with walking and standing, and reported popping and grinding in the knee cap area with going up and down inclines. (Id.)

On exam, Claimant had full range of motion of all joints of the upper extremities with complaints of increasing neck pain with shoulder movement. (Tr. at 262.) She had normal strength and there was no evidence of atrophy. (Id.) Cervical and lumbosacral spine range of motion was limited and she had tenderness to palpation. (Tr. at 262-63.) Straight leg raising testing was negative on the left and positive on the right at 90 degrees. (Tr. at 263.) Sensation was intact throughout the lower extremities and motor strength testing was normal. (Id.) Claimant had full range of motion of all joints of the lower extremities, including both knees, though she had some tenderness to palpation of the left knee. (Id.) She was able to heel and toe walk without weakness, her gait was not antalgic in nature, and she was able to squat with difficulty and with complaints of knee and back pain. (Tr. at 264.)

Dr. Kropac diagnosed cervicodorsal musculoligamentous strain; and contusion, left knee with

residual patellofemoral chondromalacia. (Tr. at 265.) He opined that her prognosis was fair and that she would require future medical care limited to medication, such as non-steroidal anti-inflammatory medication, analgesic medication, and muscle relaxant medication only, and that surgical intervention was not recommended regarding her neck or left knee injury. (Id.)

   ***Princeton Community Hospital***:

   An MRI of Claimant's pelvis, dated September 12, 2008, revealed no evidence of abnormal signal or asymmetrical mass, moderate to marked distention of the urinary bladder, and prominent degenerative changes at L4-L5 and L5-S1 and posterior bulging. (Tr. at 277.) Images of Claimant's thoracic spine were normal. (Tr. at 278.) The x-rays of Claimant's lumbosacral spine on January 30, 2009, revealed moderate L4-5 and L5-S1 intervertebral joint space narrowing with mild dextroscoliosis. (Tr. at 276.) The MRI of the lumbosacral spine on January 30, 2009, revealed mild posterior disc bulging at L4-5 and L5-S1. (Tr. at 275.)

   ***Dr. Wilson***:

   Claimant treated with Dr. Wilson from January 8, 2004, through July 30, 2009. (Tr. at 393-474.) In September, 2008, Claimant reported a sudden onset of low back pain when she bent over to pick up a towel. (Tr. at 425.) An MRI of Claimant's lumbar spine on September 12, 2008, revealed a central protrusion of the intervertebral disc at the L4-L5 level producing encroachment upon the thecal sac. (Tr. at 472.) Claimant continued to report lots of low back pain on September 29, 2008, and serious back pain on October 6, 2008. (Tr. at 421, 423.) By November 12, 2008, Claimant reported that the back pain had radiated down both legs. (Tr. at 419.)

   ***Dr. Raymond V. Harron, M.D. - The Neurological Center of Southwest Virginia***:

   Claimant was evaluated by Dr. Harron on November 3, 2008, for complaints of low back pain, with bilateral pain, numbness, and tingling into both extremities, primarily the right one. (Tr. at 370-71.) On examination, Dr. Harron observed a moderate degree of muscular spasm. (Tr. at 370.) Claimant had negative straight leg raising testing bilaterally with pain, and intact and symmetrical

14

sensation although she reported numbness and tingling in both legs. (Id.) She had a significant limp of her right leg and a more moderate limp of her left lower extremity with ambulation. (Id.) Dr. Harron recommended bilateral L4-5 laminectomy and foraminotomy for decompression of the neural elements. (Tr. at 371.) Claimant underwent the procedure on November 25, 2008. (Tr. at 382-83.) She returned to Dr. Harron on February 4, 2009, for a post-surgical evaluation. (Tr. at 372.) Dr. Harron noted on exam that she ambulated with a cane, had considerable lumbar spasm, had negative straight leg raising testing bilaterally but had tightness in her hamstrings with pain in her back at eighty to ninety degrees, two out of four deep tendon reflexes, and intact and symmetrical sensation down to the ankle, where she reported decreased sensation on the right. (Id.) Dr. Harron noted that the MRI on January 30, 2009 (Tr. at 375, 470-71.), showed post-operative changes at L4-5 and some mild disc bulging at L4-5. (Tr. at 372.) The image however, did not show any significant nerve root or spinal thecal sac compression at any level, though she had a small fluid collection, which Dr. Harron believe had resolved. (Id.) He recommended she start physical therapy. (Id.)

   ***Dr. Wilson***:

   Following surgery, Claimant reported on January 5, 2009, that she was doing better. (Tr. at 416.) Dr. Wilson noted that Claimant was improving. (Id.) On February 3, 2009, Claimant again noted that she was doing better and that she was not in as much pain. (Tr. at 415.) Dr. Wilson noted that she was ambulating and sitting better. (Id.) On March 6 and March 19,  2009, however, Claimant reported that her back was very painful. (Tr. at 411, 413.) Dr. Wilson assessed disc disease. (Id.) On April 10, 2009, Claimant indicated that she had experienced muscle spasms for five days in her low back. (Tr. at 408.) She reported on May 26, 2009, that she had bent over and heard her back pop and had back pain since then. (Tr. at 404.) She continued to report back pain and muscle spasms throughout June, 2009. (Tr. at 401-03.) Dr. Wilson noted on July 30, 2009, that Claimant was walking better and had better posture, although she had low back pain on the right. (Tr. at 399.) She also reported right hip pain. (Id.)

15

On July 30, 2009, Dr. Wilson completed a Routine Abstract Form - Physical, for purposes of determining disability. (Tr. at 394-98.) Dr. Wilson noted that Claimant was using a walker until about 14 months ago and that she now uses a cane and a short ankle brace on her right lower extremity. (Tr. at 394.) Dr. Wilson noted that Claimant walked with a limp on the right and a slow and deliberate gait; had reduced range of motion and weakness of her right leg; had swelling, tenderness, and weakness in her right leg; and decreased range of motion of her left leg. (Tr. at 395.) Claimant also had decreased sensation in her right leg and left foot, decreased strength of 3/5 in her right leg, edema in her right leg, and both legs were markedly cold. (Tr. at 396-97.) Dr. Wilson diagnosed chronic low back pain, status-post laminectomy, somatic dysfunction, stress incontinence, abnormal gait, and constipation. (Tr. at 397.)

### Dr. Robert J. Crow, M.D. - Neurological Associates, Inc.:

On June 16, 2009, Dr. Crow conducted a neurological evaluation at the request of Dr. Wilson for Claimant's reports of chronic low back pain and right lower extremity pain. (Tr. at 390-92.) On exam, Dr. Crow noted that Claimant ambulated with a cane with a right ankle brace, she ambulated with a significant antalgic gait towards the right, she had no heel walking strength in the right, and toe walking strength was good bilaterally. (Tr. at 391.) Range of back motion was limited severely, straight leg raising testing caused back pain bilaterally, motor exam was notable for breakaway weakness involving the right side, sensation was diminished to pinprick over the bilateral calves and foot, reflexes were intact and symmetrical, and pulses were palpable in both feet. (Tr. at 391-92.) Dr. Crow assessed chronic low back and right lower extremity pain, status post L4-5 decompression. (Tr. at 392.) He recommended that Claimant follow-up with her neurosurgeon, though nothing led him to think that further surgery was indicated. (Id.) He believed that continued conservative treatment, with physical therapy and pain clinic was the proper course of treatment. (Id.)

### Bluestone Health Center:

Claimant also treated at Bluestone Health Center from November 5, 2004, through June 15,

16

2009, for acute sinusitis and pharyngitis (Tr. at 344, 347, 349-50, 352.), viral syndrome and possible influenza (Tr. at 351.), Neutropenia (Tr. at 348.), and urinary tract infections (Tr. at 346.), among other illnesses. (Tr. at 343-64.) On March 12, 2009, she complained of low back pain following her surgery, and Dr. Clarkson noted that she ambulated with a cane. (Tr. at 345.) Claimant reported that she was unable to feel any sensation in her right foot from the mid-calf to the end of her toes. (Id.) She had some dorsiflexion and plantar flexion of the foot, but it was weak. (Id.) On June 8, 2009, Dr. Clarkson noted that Claimant wore an air splint on her right ankle, that she ambulated with a cane, had no edema, and her neurological exam was intact. (Tr. at 344.)

### Dr. James Egnor, M.D. - Physical RFC Assessment:

On August 5, 2009, Dr. Egnor completed a form RFC assessment on which he opined that Claimant was capable of performing light exertional level work that involved limited pushing and pulling with the right lower extremity, occasional postural limitations, and allowed avoidance of concentrated exposure of extreme cold and vibration. (Tr. at 475-82.) Dr. Egnor noted that due to a possible foot drop, Claimant could have problems operating foot pedals with his right foot. (Tr. at 476.)

On August 13, 2009, Dr. Egnor reviewed Dr. Wilson's Routine Abstract Form and completed a second Case Analysis. (Tr. at 497.) In view of Dr. Wilson's opinion, Dr. Egnor opined that it was reasonable to reduce Claimant's RFC to sedentary work with occasionally lifting ten pounds, frequently lifting less than ten pounds, standing and walking two to four hours, sitting six hours, a sit/stand option for relief every one to two hours as needed, and that use of a cane might be needed for walking longer distances. (Id.)

### Dr. Porfirio Pascasio, M.D. - Physical RFC Assessment:

On January 26, 2010, Dr. Pascasio completed a form RFC assessment on which he opined that Claimant was capable of performing light exertional level work that required occasional postural limitations; never required climbing ladders, ropes, or scaffolds; allowed an avoidance of concentrated

exposure to extreme cold and vibration; and an avoidance of even moderate exposure to hazards. (Tr. at 513-20.) Dr. Pascasio noted that he reviewed Dr. Egnor's August 5, 2009, assessment. (Tr. at 520.)

*__Princeton Community Hospital__*:

An MRI of Claimant's right hip on January 27, 2010, essentially was a negative exam. (Tr. at 549.) Images of her cervical spine on November 24, 2010, revealed mild osteoporosis, but otherwise, were unremarkable. (Tr. at 542.) An MRI of her cervical spine revealed minimal asymmetric bulging of the disc towards the left of midline at C2-C3, but otherwise, was within normal limits. (Tr. at 543.) An MRI of Claimant's lumbar spine on November 27, 2010, showed no evidence of disc protrusion, and a mild persistent disc bulge at L4-L5. (Tr. at 547-48.) It also demonstrated mild central disc protrusion at L5-S1, distant from the thecal sac and with no apparent contact with the S1 nerve roots. (Tr. at 548.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to give proper weight to the opinion of Dr. Wilson, Claimant's treating physician. (Document No. 12 at 4-6.) Claimant asserts that the ALJ failed to reference Dr. Wilson's July 30, 2009, medical abstract form in which he opined that Claimant was required to use a cane and right ankle brace, had a slow and abnormal gait with a slight right limp, had abnormal range of motion of her right leg and weakness of her right ankle, had sensory deficits and numbness in her right leg and left foot, had 3/5 motor strength in her right leg, had impaired coordination, and had markedly cold lower extremities. (Id. at 4-5.) Claimant also alleges that the ALJ failed to reference Dr. Egnor's case analysis form of July 30, 2009, wherein he noted that in light of Dr. Wilson's July 30, 2009, opinion, Claimant was reduced to performing sedentary exertional level work with a sit/stand option every one to two hours as needed for pain relief, and that use of a cane was required for walking longer distances. (Id. at 5.) Claimant asserts that although the ALJ referenced Dr. Pascasio's report, Dr. Pascasio never reviewed Dr. Egnor's report of August 13, 2009, or Dr. Wilson's report of July 30, 2009. (Id.)

Claimant contends that the ALJ failed to resolve these conflicts in the evidence. (Id. at 8-9.) Dr. Pascasio assessed a light RFC, whereas Dr. Egnor assessed a sedentary RFC with a sit/stand option and the use of a cane for walking longer distances. (Id. at 8.) Dr. Pascasio's opinion cannot rebut Dr. Egnor's opinion because he did not review Dr. Egnor's opinion and mistakenly believed he was affirming a prior finding of Dr. Egnor that Claimant was limited to light work. (Id. at 9.) Dr. Pascasio also did not review Dr. Wilson's July 30, 2009, report. (Id.) The ALJ, however, failed to acknowledge any conflict between the reports of Drs. Egnor and Pascasio, and therefore, Claimant contends that the case must be remanded as additional fact-finding cannot be made to resolve conflicts in the evidence. (Id. at 8-9.)

In response, the Commissioner asserts that the fact that the ALJ failed to reference specifically the two reports from Drs. Wilson and Egnor does not change the fact that substantial evidence supports the decision that Claimant was not disabled. (Document No. 15 at 10-13.) The Commissioner asserts that even if the ALJ had limited Claimant to sedentary work as indicated by Dr. Egnor, a significant number of jobs still exist in the economy that Claimant could perform as identified by the VE in response to a hypothetical that included all the ALJ's assessed limitations except for the exertional level. (Id. at 11.) The Commissioner asserts that the limitations were consistent with Claimant's testimony. (Id.) The Commissioner notes that although Dr. Egnor opined that Claimant might need a cane for walking longer distances, sedentary jobs did not require her to walk longer distances. (Id. at 12.) Accordingly, the Commissioner contends that although the ALJ did not discount Dr. Wilson's July 30, 2009, opinion, or Dr. Egnor's August 13, 2009, case analysis, such error is harmless and would not change the outcome of the case because the VE identified a significant number of sedentary jobs that Claimant could perform. (Id. at 13.)

In Reply, Claimant asserts that Dr. Wilson's opinion was entitled special weight under the treating physician rule, which was not given because the ALJ failed to acknowledge his opinion in the first place. (Document No. 17 at 4-5.) Claimant asserts that the ALJ's most important findings in her

decision were based upon the out of date findings of Dr. Egnor of August 5, 2009, which were made part of the hypothetical question to the VE, and not upon the findings of Dr. Egnor of August 13, 2009. (Id. at 5.) Claimant again asserts that the ALJ apparently adopted Dr. Pascasio's light RFC assessment, which did not mention the conflicting evidence from Drs. Egnor or Wilson. (Id. at 8-9.) Claimant asserts that at this stage of the review process, the Court is forbidden from undertaking additional fact-finding to resolve the conflicts in the evidence that the ALJ failed to address, and therefore, remand is required. (Id. at 9.)

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence because all six of the hypothetical questions posed to the VE failed to include the limitation that Claimant can perform only occasional overhead reaching. (Document No. 12 at 6-7.) Claimant points out that this limitation was assessed by the ALJ herself, and therefore, asserts that such a limitation should have been included in her hypothetical questions. (Id. at 6.) Furthermore, Claimant asserts that the hypothetical questions failed to include Dr. Wilson's limitations arising out of use of a cane for ambulation and ankle brace, motor weakness, antalgic gait, and sensory deficits. (Id. at 7.) Additionally, the ALJ failed to include limitations arising from Dr. Egnor's limitations for a sit/stand option every one to two hours and the use of a cane for walking longer distances. (Id.)

In response, the Commissioner asserts that contrary to Claimant's assertion, the ALJ's very first hypothetical question included a limitation of overhead reaching, and the last hypothetical question asked the VE to consider the limitations from the first question except that the individual was limited to sedentary work rather than light work. (Document No. 15 at 13-14.) Regarding limitations arising from use of a cane or her right lower extremity weakness and sensory loss, the Commissioner asserts that the sedentary jobs identified by the VE would not require walking long distances such that Claimant would need to utilize a cane. (Id. at 14.) Additionally, the Commissioner notes that the ALJ's last hypothetical question, consistent with Dr. Egnor's opinion, included a limitation that the claimant could not perform pushing or pulling with her lower extremity. (Id.) Finally, the Commissioner asserts

that regarding the sit/stand option, Claimant testified that she was able to sit and needed to shift positions only from one hip to another. (Id.) Thus, the ALJ did not err by not including a sit/stand option as the absence of such was consistent with Claimant's testimony. (Id.) The Commissioner contends that the VE's testimony provides substantial evidence to support the ALJ's decision. (Id.)

Analysis.

1. Opinion Evidence.

Claimant alleges that the ALJ erred in assessing the opinions of Dr. Egnor and Dr. Wilson. (Document No. 12 at 4-6, 7-9.) Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2011). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling

weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2011). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

Claimant correctly points out that the ALJ failed to acknowledge either the July 30, 2009, opinion of Dr. Wilson or the August 13, 2009, opinion of Dr. Egnor. The ALJ's failure to acknowledge and consider these opinions constitutes error. The undersigned finds, however, as the Commissioner argues, that such error is harmless. Dr. Wilson's July 30, 2009, "opinion" essentially was a medical

22

statement respecting Claimant's condition to the extent that she walked with a cane, wore a brace on her right leg, walked with a limp on the right, had a slow and deliberate gait, and had some reduced range of motion, weakness, and strength in her lower extremities, as well as marked coldness of her legs. (Tr. at 396-97.) Based on this medical statement, Dr. Egnor amended his August 5, 2009, RFC assessment of light exertional level work and reduced it on August 13, 2009, to reflect sedentary exertional level work, with standing and walking two to four hours, sitting six hours, and a sit/stand option for relief every one to two hours as needed. (Tr. at 475-82, 497.) Dr. Egnor opined that Claimant "might" benefit from the use of a cane for walking longer distances. (Tr. at 497.) Dr. Pascasio then reviewed only Dr. Egnor's August 5, 2009, assessment and opined on January 26, 2010, that claimant was capable of performing light exertional level work with additional limitations. (Tr. at 513-20.) The ALJ acknowledged in her decision only Dr. Egnor's August 5, 2009, RFC assessment and Dr. Pascasio's January 27, 2010 (Tr. at 17.), to whose opinions she accorded some weight as their opinions were consistent with the objective findings and Claimant's treatment history. (Tr. at 20.)

As Claimant aptly notes, the ALJ, however, failed to resolve the conflict between Dr. Egnor's amended RFC assessment and Dr. Pascasio's opinion because she failed to consider Dr. Egnor's August 13, 2009, opinion. Nevertheless, in her hypothetical questions to the VE, the ALJ asked the VE first to consider all the limitations she assessed in her RFC. (Tr. at 45.) In her fifth and sixth hypothetical questions, she asked the VE to consider the same limitations except that the Claimant would have been limited to sedentary exertional level work rather than light exertional level work. (Tr. at 49.) The VE identified three unskilled, sedentary jobs that Claimant could perform in significant numbers in the national and regional economies. (Tr. at 50.) Thus, even if this Court were to remand this matter to the ALJ to correct her errors in failing to address all the evidence and resolve the conflict in the evidence, which at most, would reduce Claimant's RFC to sedentary exertional level work, the outcome would remain the same: the ALJ would continue to find that Claimant was not disabled. Accordingly, the undersigned finds that any error that the ALJ may have committed in these regards

23

is harmless and that remand is not appropriate given these circumstances.

2. Hypothetical Questions.

Claimant also alleges that the ALJ erred in failing to include all the limitations in the hypothetical posed to the VE. (Document No. 12 at 6-7.) To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. See Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

Claimant concedes that the ALJ included in her hypothetical questions limitations regarding overhead reaching. Accordingly, the undersigned finds that this claim is moot and will not address this matter. Claimant asserts that the ALJ also failed to include a limitation for use of a cane for walking longer distances. As discussed above, the ALJ did pose a hypothetical question that included all the limitations assessed by the ALJ except that the Claimant would be reduced to sedentary exertional level work. (Tr. at 49.) In response, the VE identified the jobs of an Assembler, Dictionary of Occupational Titles ("DOT"), Occupational No. 713.687-018 ("Final Assembler"); Packer, DOT Occupational No. 731.685-014 ("Stuffer"); and Inspectors, Testers, and Sorters, DOT Occupational No. 712.687-018 ("Gauger"). (Tr. at 50.) These jobs do not require Claimant to walk longer distances, and therefore, the use of the cane as might be necessary as suggested by Dr. Egnor would not be required for these sedentary jobs. The criteria of these three jobs specifically state that they are

24

sedentary jobs, which is defined as working that "involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met." 1991 WL 679271 (Final Assembler); 1991 WL 679811 (Stuffer); 1991 WL 679247 (Gauger). Thus, there was no need to have included such a limitation in the hypothetical. Additionally, although Dr. Wilson noted that he used an ankle brace and had an antalgic gait, motor weakness, and sensory deficits, he did not assess any physical limitations resulting therefrom and neither did Drs. Egnor or Pascasio in the opinions considered by the ALJ that were not considered and accounted for. These limitations also were accounted for in the fact that Claimant would not have been required to walk longer distances.

Finally, Claimant asserts that the ALJ failed to include in the hypothetical questions a limitation regarding the sit/stand option assessed by Dr. Egnor. Claimant is correct that such a limitation was not included in any hypothetical question. The <u>DOT</u> does not indicate whether any jobs have a sit/stand option. <u>See</u> <u>Corbett v. Barnhart</u>, 2006 WL 5527015 *62 (N.D. W.Va. Mar. 24, 2006)("a search of the <u>DOT</u> itself indicates there is no reference to a sit-stand option at all."). Information regarding the applicability of a sit/stand option must be elicited from a VE. <u>Id.</u>; see also SSR 00-4p (stating that the ALJ must obtain a reasonable explanation for any conflicts between the <u>DOT</u> and the VE.). In this instance, the ALJ failed to inquire of the VE respecting the sit/stand option imposed by Dr. Egnor because she ignored Dr. Egnor's latter opinion. Though the Court has addressed the propriety of all other limitations assessed in Dr. Egnor's opinion, the Court is constrained from imposing its opinion respecting the applicability of sit/stand option without vocational expert testimony. Accordingly, for this limited reason, the undersigned finds that the matter must be remanded.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 12.), **DENY** the Defendant's

Motion for Judgment on the Pleadings (Document No. 15.), **REVERSE** the final decision of the Commissioner, **REMAND** this matter for further proceedings consistent with this Proposed Findings and Recommendation pursuant to the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: August 28, 2014.

R. Clarke VanDervort
United States Magistrate Judge